**THE LAW OFFICE OF MARTIN KANFER**
**3 Northern Boulevard, 2nd Floor**
**Great Neck NY 11021**
**516-482-6293**
**kanferlawoffice@yahoo.com**

May 23, 2017

**Via ECF**
Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York NY 10007

*Re: Lennon v. United States of America, OCDT J. Maddan and the United Kingdom 16 CIV 9876 (PAE)*

Dear Judge Engelmayer:

This office represents the plaintiff in the above referenced matter and responsive to defendant's third request to extend the time in which to answer the claim arising herein plaintiff responds as follows:

The defendants have been on notice of the SOFA claim since May 15, 2015. The defendants have a written statement from the soldier in question, (Which they refuse to acknowledge and or admit) which they provided to the plaintiff's counsel. (Exhibit A)

The answer was due on March 10, 2017 and Plaintiff has consented twice to defendant's applications for an extension of time to answer.

The defendant's shockingly have failed to appraise the court of the real facts.

The soldier in question was here for the Sandhurst games a military Olympics being held at West Point. He was training to represent the United Kingdom at the games when he physically ran over the plaintiff in New York City. Upon information and belief his training for the games was part of his service and clearly within the scope of his duty as set forth in the SOFA

Defendant must timely answer and provide the witness for oral examination and deposition either in person or via video means. Discussion of motion practice prior to any discovery is patently meritless.

Respectfully,

Martin Kanfer, (MK1895)

**<u>Exhibit "A"</u>**

## OCdt J H Maddan's account of an incident on 5.4.14

## and subsequent developments to 30.7.14 (day of writing)

**Background**

25 cadets are selected from RMAS to travel to Westpoint (USMA) to compete in the Sandhurst Cup competition each year. I had been selected for the 2014 team. As such we had a period of acclimatisation in New York as a unit to mark the transition from an intensive training regime at RMAS before heading to Westpoint for final preparations. Fitness was the foundation to the team's ability. Hence we completed some training runs in the New York to prevent fitness fade.

**5.4.14**

Around eight cadets (including Stewart, Fellows, Spencer-Chapman and Barr) and myself went for a run from our hotel at around 7:30am (The Soldiers', Sailors', Marines', Coast Guard and Airmens club) to Central Park along Lexington avenue. As I briefly sidestepped along the pavement, which was practically deserted (or so I thought), to allow the second man (Fellows)in the running group, to catch up, my attention drifted from direction of travel to speak to Fellows. I then collided with a pedestrian who was standing perpendicular to our direction of travel looking at his phone (I hadn't seen him at all). The pedestrian, Patrick Lennon, had just finished a night shift at Fitzpatrick Hotel where he works as a porter. Unfortunately the collision meant Mr Lennon fell over and hit his head on the pavement. According to the Ocdts running with me Mr Lennon made no attempt to break his fall with his arms. So what would normally have been an irritating but essentially harmless fall, ended up causing a cut to the eyebrow. Blood was flowing and Mr Lennon was clearly stunned, repeating himself often, though remaining conscious and intelligibly responsive to questions. I took control of the situation and ushered him into a reception hall directly off the pavement. I had Ms. Barr call an ambulance on the receptionist's phone, until Mr Lennon insisted that he didn't want one. In the meantime we used the washroom facilities to clean up the blood. After 5-10mins we had established that Mr Lennon didn't need an ambulance, that he had broken his spectacles and there was blood on his shirt. Mr Lennon was a understandably a mixture of compliant and angry (though not aggressive).

At this point I should mention my consideration which sets the tone of the subsequent developments. I was clear from the outset that I was entirely to blame for Mr Lennon's demise. As such I immediately made it clear to him that it was my intention to waive the personal cost arising out of the incident. Namely repairing his broken glasses and laundering of his stained shirt. All of which; Mr Lennon didn't really seem to want, his desire, again understandably, was to get home.

However I established from Mr Lennon that he worked just around the corner at a hotel. As such I resolved to take him back there so that he was looked after and his employer, who he seemed concerned about, was aware that Mr Lennon was not at fault. The receptionists showed concern on entry and took him into a ground floor room out of my sight. I spoke to the receptionist/duty manager about the incident and again expressed my concern that Mr Lennon didn't cover the cost himself. They shared their details and took mine on behalf of Mr Lennon. One of the hotel staff then confided to me that Mr Lennon had an underlying heart condition and that they were going to call an ambulance to ensure he was fine. They also called the LAPD who arrived simultaneously with the

ambulance. However the two policemen left practically instantly confident in the knowledge that it was a complete accident with nothing premeditated or intended. The medics inspected Mr Lennon, they were in two minds as to whether to take him to hospital or not. One medic persuaded his colleague after five minutes or so to take him into hospital on account of Mr Lennon's low blood pressure or pulse-rate (I forget which) combined with his heart condition which the hotel staff had informed them of. I again expressed my sympathy to Mr Lennon and ensured he knew the hotel had my details for him to contact me over incurred expenses and left after he was transported to hospital.

I had escorted Mr Lennon to the hotel individually, letting the other team members to carry on running, confident that all was in hand. On return to my hotel I informed OC Sandhurst Cup Squad (Capt. Fillipich) of the incident, essentially outlining what happened and how I was content that the situation was under control.

**Subsequent developments**

My intention remained that I believed Mr Lennon should have financial support over the incident especially since he clearly was not paid relatively well and I was the cause of his inconvenience.

**There was no communication from Mr Lennon until I received a very unclear voicemail sometime before 23.5.14. But both private number and indecipherable number (which I tried many times to comprehend) meant I began to try and establish the Hotel he worked at in order to contact Him. However he tried to contact me, this time successfully via email, the thread of which is below:**

Patrick Lennon <p.lennon347@gmail.com> 23 Apr

Hi I am the guy you push down on the street in NYC can you please call me I have bills to pay thank you thank you I was hurt

Humphrey Maddan <humphrey.maddan@gmail.com> 24 Apr

Hi Patrick,

Very pleased to have made contact with you as I lost the contact details you gave me and so have been trying to text you and also find out which hotel you work at.

What is the amount you need covering? How are you doing now?

Thank you.
Yours sincerely,
Humphrey Maddan

P.S. From tonight I am in Africa for a week (until 1st May) so will not have internet. But I will be able to pay as soon as I get back.

Patrick Lennon <p.lennon347@gmail.com> 24 Apr

I can you text by your cell phone it better for me. Do you get text by your cell phone did you get my last text let me thank you

Humphrey Maddan <humphrey.maddan@gmail.com> 24 Apr

I havent got any texts from you yet so probably more reliable to keep using my gmail address.

Patrick Lennon <p.lennon347@gmail.com> 24 Apr

Ok I will I try texting by my. Cell phone that why it did get them sorry. Sent pic to you to can you call me at 12 15pm my time so we can talk thank

Patrick Lennon <p.lennon347@gmail.com> 24 Apr

Patrick Lennon <p.lennon347@gmail.com> 1 Ma y

P.lennon347@gmail.c...

Humphrey Maddan <humphrey.maddan@gmail.com> 2 Ma y

Patrick, still no pictures have come through. It will be relatively expensive for me to call you from Uk - can you email the details here?

Also let me know your account number and sort code so I can transfer the money.

Thank you, I'm now able to pick up email all the time so will be able to reply quickly.

Patrick Lennon <p.lennon347@gmail.com> 7 Ma y

Humphrey Maddan <humphrey.maddan@gmail.com> 8 Ma y

Patrick, I have your email address already! What are the details of the bills you want me to pay? Humphrey

**There was no response from the above until the new thread below on 4.6.14:**

Patrick Lennon <p.lennon347@gmail.com> 4 Ju n

Need to hear from You asap

Humphrey Maddan <humphrey.maddan@gmail.com> 5

Ju
n

Patrick, apologies for slow response. I have been away from internet for the last two weeks. I am now back online - please send me an electronic copy of the documents so I can make a decision. This will also save you the cost of the postage (and the delay) of sending it across the atlantic.

Many thanks, H

**Patrick Lennon** <p.lennon347@gmail.com> 5
Ju
n

There to many to sent electronic I can mail them to you thank you

**Humphrey Maddan** <humphrey.maddan@gmail.com> 6
Ju
n

Ok, but surely your hotel can help you scan?
If that's not possible: my address is
Ocdt Maddan
37 Pl
RMAS
GU15 4PQ.
UK

Please send only PHOTOCOPIES as that will provide the information and I'm not going to pay to send documents back to america as well.
Thank you, Humphrey

**End of all email communication. I never saw any other details or other information from Mr Lennon. Next time I heard from Mr Lennon was via the Lawyer Martin Kanfer (see attached letter).**

## Summary:

My intention was (and still is) to reimburse Mr Lennon of costs incurred to himself resulting from the collision on 5.4.14. I intended to cover this by myself as I calculated costs to be small: broken spectacles and a small cut to the forehead with no real signs of any substantive concussion (more shock), indeed the hotel had even said they would launder his shirt. As such I considered this to be 1) morally the right course of action 2) the simplest and cheapest financial solution for us both.

However the inclusion of a legal suit on Mr Lennon's side complicates the matter. For I am now wary that more extensive medical costs connected with the fore-mentioned heart condition may try and be pinned to myself. The nature of the communication attached indicates financial opportunism.

As such I am now coerced to transition from personal communication with Mr Lennon to seeking legal assistance and to investigate MOD insurance cover. This is in order to avoid error in handling the matter and to ensure correct funds are paid by the correct methods.

It may seem confusing as to why I didn't pursue this initially. This is because I believed a swift resolution for myself and Mr Lennon would suit us both. And it is worth confirming that I had resolved from the outset to seek legal assistance if the costs were surprisingly high. However as the email thread shows; Mr Lennon wasn't forthcoming with relevant details necessary for me to reach a decision about this.

4.viii.14

OCdt James Humphrey Maddan

30109681