UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PATRICK LENNON,

                       Plaintiff,                        16 Civ. 9879 (PAE)

        -v-                                          OPINION & ORDER

UNITED STATES OF AMERICA, OCDT J. MADDAN,
and the UNITED KINGDOM,

                       Defendants.
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This case involves tort claims arising out of a sidewalk collision between a jogger and a pedestrian. Plaintiff Patrick Lennon claims that he suffered injuries when James Maddan, an officer-cadet in the British Armed Forces who was jogging in midtown Manhattan, collided with him. Lennon brings negligence claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, not only against Maddan, but also against the United States of America (the "United States" or the "Government") and the United Kingdom. The United States moves to dismiss the claim against it under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, arguing that it is entitled to sovereign immunity. For the reasons that follow, the Court grants that motion.

I. **Background**

    A. **Factual Background**[1]

---

[1] The facts related here are drawn largely from the First Amended Complaint, Dkt. 24 ("FAC"). The Court also refers to the Declaration of Elizabeth Barr in support of the motion to dismiss,

In 2014, Maddan was a cadet in training at the Royal Military Academy Sandhurst ("RMAS"). Barr Decl. ¶ 4; Maddan Statement at 1. In April 2014, he and 24 other cadets were chosen by RMAS to participate in the Sandhurst Competition, an annual international military competition scheduled for April 11 and 12, 2014, at the United States Military Academy at West Point. Barr Decl. ¶¶ 4–5; Maddan Statement at 1.

The week before the competition, Maddan and his fellow RMAS cadets were billeted in a New York City hotel, in order to acclimate and prepare for the competition. FAC ¶¶ 14, 18–19; Barr Decl. ¶¶ 6–7; Maddan Statement at 1. All RMAS cadets are expected to maintain their fitness; fitness is essential to performance in the Sandhurst Competition. Barr Decl. ¶ 7; Maddan Statement at 1. To prevent "fitness fade," the cadets took training runs in New York City. Maddan Statement at 1. The cadets took these runs on their own initiative, and the timing and routes of these runs were determined solely by the cadets. Barr Decl. ¶ 7.

One such run took place at approximately 7:30 a.m. on the morning of April 5, 2014. Barr Decl. ¶ 7; Maddan Statement at 1. During the run, as Maddan turned to speak to a fellow cadet, he collided with Lennon, who was waiting at a Lexington Avenue crosswalk. FAC ¶¶ 4, 7; Maddan Statement at 1. Struck from behind, Lennon fell to the pavement. FAC ¶ 7; Maddan Statement at 1. Lennon suffered head and knee injuries. FAC ¶ 29. The latter required arthroscopic surgery and resulted in a permanent disability. *Id.*

B.   **Procedural History**

---

Dkt. 29 ("Barr Decl."), and the documents attached to plaintiff's opposition brief, Dkt. 31 ("Pl. Br."), including Maddan's signed statement, Dkt. 31-1 ("Maddan Statement"). *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."); *see also Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[W]hen, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise.").

On April 13, 2016, Lennon submitted a claim for $250,000 to the United States Department of the Army. FAC ¶ 22. On July 13, 2016, the Department of the Army rejected this claim. *Id.* ¶ 23.

On December 28, 2016, Lennon filed a complaint in this action. Dkt. 1. On February 10, 2017, all three defendants were served. Dkts. 3–5. On June 14, 2017, following two extensions, Dkts. 7, 9, the Government moved to dismiss for lack of subject matter jurisdiction, Dkt. 13. On July 20, 2017, Lennon filed the FAC. Dkt. 24. On August 10, 2017, the Government filed the instant motion to dismiss on the same grounds. Dkt. 27. On September 14, 2017, Lennon filed a memorandum in opposition, Dkt. 31, and on September 28, 2017, the Government filed a reply, Dkt. 32.

Maddan and the United Kingdom have not appeared in this case.

## II. Applicable Legal Standards

The standards governing subject matter jurisdiction in this case turn on the obligations of the United States under the Status of Forces Agreement, an international pact under which, in some circumstances, the United States may be liable for tortious conduct in this country by service members of other North Atlantic Treaty Organization ("NATO") countries. The Court first reviews the governing standards and then applies them to Lennon's allegations as to Maddan.

### A. Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted). In

3

resolving a motion to dismiss under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff." *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks omitted). Instead, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113.

### B. The United States' Obligations Under the Status of Forces Agreement

The United States and the United Kingdom are members of NATO. *See* North Atlantic Treaty, Aug. 24, 1949, T.I.A.S. No. 1964. Tort claims against service members of one NATO member state physically present in another state are governed by the Status of Forces Agreement ("SOFA"). It reads in relevant part:

> Claims . . . arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible, and causing damage in the territory of the receiving State to third parties, . . . shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of its own armed forces.

Status of Forces art. VIII, cl. 5(a), Oct. 27, 1953, T.I.A.S. No. 2846.

The SOFA's enabling act, the International Agreement Claims Act, adopts SOFA's language. It provides that where a tort is alleged to have been committed on American soil by a visiting NATO service member, the claim may be adjudicated "as if the acts or omissions upon which they are based were the acts or omissions of a member or a civilian employee of an armed force of the United States." 10 U.S.C. § 2734b(a). Accordingly, "the local citizen who is injured

4

proceeds against his own government exactly as he would if the injury had been caused by a member of his own government's armed forces." *Shafter v. United States*, 273 F. Supp. 152, 156 n.4 (S.D.N.Y. 1967) (internal quotation marks omitted), *aff'd* 400 F.2d 584 (2d Cir. 1968). Thus the host country—here the United States—may be held liable for torts committed by service members of visiting NATO states.

### C. The Federal Tort Claims Act

The FTCA provides a means for such a plaintiff to proceed against the United States. As a general matter, courts lack jurisdiction to entertain suits against the United States where it has not consented to suit and thereby waived its sovereign immunity. *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007). The FTCA, however, "constitutes a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances." *Id.* (citation and quotation marks omitted).

One specified circumstance, for which the FTCA provides the "exclusive" remedy, is a claim alleging personal injury resulting from the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. §§ 1346(b)(1), 2679(b)(1).[2]

This exception applies only to torts allegedly committed by a Government employee "acting within the scope of his office or employment." *Id.* § 1346(b)(1). In the case of a military member, this phrase is defined as "acting in line of duty." *Id.* § 2671. "The courts have uniformly equated the FTCA's 'line of duty' language with the phrase 'scope of employment,' as

---

[2] "Employee of the [G]overnment" is defined to include "members of the military or naval forces of the United States." *Id.* § 2671.

5

that concept is defined by the *respondeat superior* law of the jurisdiction in which the accident occurred." *Taber v. Maine*, 67 F.3d 1029, 1033 (2d Cir. 1995).[3]

### D. "Scope of Employment" Under New York Law

Under New York law, "an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 470 (1969)) (alterations and internal quotation marks omitted). This standard is conjunctive: An employee acts within the scope of his employment only when both elements are satisfied. *See Hamm*, 483 F.3d at 138.

## III. Discussion

In moving to dismiss, the Government disputes that the jogging Maddan was acting within the scope of his employment, as defined under New York law, when he collided with Lennon. The Court agrees with the Government that Maddan was not: When Maddan took his fateful morning run, he was acting outside his employer's control, such that Lennon's claims against the United States fail to satisfy a necessary prong of New York's scope-of-employment test. The Court therefore grants the motion to dismiss. This dismissal on this ground leaves intact Lennon's claims against the United Kingdom and Maddan.

Lennon, significantly, has not alleged that Maddan was under specific orders to exercise on the morning of April 5, 2014. And any such claim would be inconsistent with the evidence

---

[3] Although whether a military serviceman was acting in the line of duty "would seem unquestionably a matter of federal law[,] courts have viewed military personnel as bound by state law and have looked to pertinent state law to define tortious behavior." *McHugh v. Univ. of Vt.*, 966 F.2d 67, 75 n.9 (2d Cir. 1992), *abrogated on other grounds by Osborn v. Haley*, 549 U.S. 225 (2007).

before the Court, which is that Maddan and his fellow cadets decided that day when and where to exercise. *See* Barr Decl. ¶ 7. Instead, Lennon contends that Maddan was acting under employer control because he had been deployed to New York City to prepare for the Sandhurst games, and his supervisors expected him to maintain his fitness through physical training. Pl. Br. at 9–12. Were he not under employer control, Lennon argues, Maddan, rather than being in New York, "could have been anywhere with anyone." *Id.* at 10.

Under New York law, Maddan's deployment to New York and his supervisors' expectation that while in New York he would stay fit through exercise are insufficient to establish employer control over him in connection with his April 5 jog. The New York Court of Appeals' decision in *Lundberg, supra,* is illustrative. The defendant there, John Sandilands, had been assigned by his employer, the State of New York, to work in Salamanca, New York. *See* 25 N.Y.2d at 469. Because Salamanca was some 80 miles from Sandilands's home in Buffalo, the State reimbursed Sandilands for his hotel fees and the costs associated with travelling home each weekend. *Id.* at 470. One Monday morning at 7:30 a.m., while commuting to Salamanca from Buffalo, Sandilands struck another vehicle, killing the driver. *Id.* Ordering dismissal of the plaintiff's claim against the State, the Court of Appeals held that Sandilands had not been under the State's control while driving, notwithstanding that the State required him to report to Salamanca and paid for his transportation. *Id.* at 471–72. As the Court explained, the State did not control Sandilands's activities outside of the work day, and the accident had taken place before the workday had begun. *Id.* at 472. Further, "the mere fact that the State had agreed to pay Sandilands'[s] travel expenses . . . did not bestow in it any right of control." *Id.* Accordingly, imposing liability for any tort committed during Sandilands's travel would be "patently unfair and beyond the scope of the doctrine of *respondeat superior*." *Id.*

7

The Second Circuit has applied these same principles to a similar fact pattern in the employment context relevant here: military employment. In *Hamm, supra,* Jonathan Goodwin, a United States Army Reservist, had been ordered to report to an Army training facility at 8 a.m. 483 F.3d at 136. Running late, Goodwin collided with another vehicle at 8:55 a.m. *Id.* Citing *Lundberg*, the Circuit held that Goodwin's conduct during his commute fell outside his employer's control, notwithstanding that the accident took place while Goodwin was late for work and acting under military orders. *Id.* at 138. First, the Court held, there is no significant distinction between the Army's control of a commuter and a private employer's. *Id.* Second, Goodwin was under no obligation to drive, let alone take a particular route. *Id.* And third, it was irrelevant that Goodwin was subject to military discipline; absent "case-specific evidence of control," it is not proper to "subject the United States to greater potential liability than a private tortfeasor." *Id.* at 139.

These cases together foreclose Lennon's claim against the United States. Although RMAS required that the cadets report to New York City, the cadets were not operating under any specific order at the moment of the accident. To the contrary, it is undisputed that Maddan and his fellow cadets independently determined how, when, and where to exercise, much as the defendants in *Lundberg* and *Hamm* independently selected the timing, method, and route of their commutes to work. Under New York law, "[l]iability in a given case depends on the actual service in the scope of the employment *at the time of the conduct complained of.*" 53 N.Y. Jur. 2d Employment Relations § 420 (emphasis added)). There is no evidence here that the cadets were required to run in the first place, let alone to do so on the morning of April 5, 2014. Accordingly, like Sandilands and Goodwin, Maddan was free at the time of his run "to do as he pleased." *Lundberg*, 25 N.Y.2d at 472.

RMAS's ongoing expectation that Maddan maintain his physical fitness does not salvage Lennon's claim. Under New York law, an employee's continuing off-duty obligation to an employer does not itself establish the employer's continuous control. *See, e.g., Johnson v. Daily News*, 34 N.Y.2d 33, 35 (1974) (rejecting *respondeat superior* liability where newspaper reporter committed tort on off day, even though reporter was under constant obligation to "assume his reportorial duties" any time he became aware of a newsworthy incident). Many employees are expected to take independent efforts to maintain their skills or qualifications. Imposing per se vicarious liability on employers who reasonably expect such off-duty conduct would be "patently unfair and beyond the scope of the doctrine of *respondeat superior*." *See Lundberg*, 25 N.Y.2d at 472. That the employer here is the military is of no moment, as this Court may not subject the United States to greater potential liability than a private tortfeasor absent case-specific evidence of control. *Hamm*, 483 F.3d at 139. Here, as explained, evidence of such control is simply lacking: Maddan's 7:30 a.m. run, undertaken at the time and place of the cadets' choosing, was not subject to RMAS's control.

The United States therefore cannot be held responsible for Maddan's misconduct.[4]

---

[4] Lennon argues separately that the Court should impose sanctions on, and tax costs against, the Government for filing a frivolous motion to dismiss. Pl. Br. at 13–14. Lennon's request is not proper, as he has not filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11. *See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion . . . ."); *Banfield v. UHS Home Attendants, Inc.*, No. 96 CIV. 4850 (JFK), 1997 WL 342422, at *3 (S.D.N.Y. June 23, 1997) ("Because Plaintiff failed to comply with . . . Rule 11's procedural requirements in moving for sanctions against Defendants' counsel, the Court denies the motion without reaching its merits."); *see also Ullman-Briggs, Inc. v. Deerfield Housewares, Inc.*, 100 F.3d 942, No. 95-7827, 1996 WL 20512, at *2 (2d Cir. Jan. 19, 1996) ("A statement in a party's brief requesting sanctions is not equivalent to a separately filed motion."). In any event, the Government's meritorious motion plainly is not sanctionable. *See Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) ("Sanctions may be—but need not be—imposed when court filings are used for an improper purpose, or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." (internal quotation marks omitted)). The Court therefore denies Lennon's request.

## CONCLUSION

For the foregoing reasons, the Court grants the United States' motion to dismiss. The Clerk of Court is respectfully directed to close the motions pending at Dkts. 13 and 27 and to terminate the United States as a party.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: November 15, 2017
       New York, New York